1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16

O

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

VICTOR M. RUBINO,                        ) Case No. EDCV 12-0250-JPR
                                         )
                    Plaintiff,           )
                                         )
          vs.                            ) MEMORANDUM OPINION AND ORDER
                                         ) AFFIRMING THE COMMISSIONER
CAROLYN W. COLVIN,                       )
Acting Commissioner of                   )
Social Security,[1]                      )
                                         )
                    Defendant.           )
                                         )

**I.    PROCEEDINGS**

        Plaintiff seeks review of the Commissioner's final decision

denying his applications for Social Security disability insurance

benefits ("DIB") and Supplemental Security Income benefits

("SSI").  The parties consented to the jurisdiction of the

undersigned U.S. Magistrate Judge pursuant to 28 U.S.C. § 636(c).

This matter is before the Court on the parties' Joint

Stipulation, filed October 25, 2012, which the Court has taken

---

        [1]     On February 14, 2013, Colvin became the Acting
Commissioner of Social Security.  Pursuant to Federal Rule of
Civil Procedure 25(d), the Court therefore substitutes Colvin for
Michael J. Astrue as the proper Respondent.

under submission without oral argument.  For the reasons stated below, the Commissioner's decision is affirmed and this action is dismissed.

**II.  BACKGROUND**

Plaintiff was born on October 23, 1960.  (AR 282.)  He has a high-school education and previously worked as an electrician.  (AR 37, 76, 312.)

On November 29, 2005, Plaintiff filed applications for DIB and SSI.  (AR 150, 282-87.)  Plaintiff alleged that he had been unable to work since November 15, 1999, because of hepatitis B and C, psoriasis, renal problems, severe joint pain, and migraine headaches, among other things.  (AR 39-40, 311.)

After Plaintiff's applications were denied, he requested a hearing before an ALJ.  (AR 194.)  A hearing was held before ALJ Thomas J. Gaye on August 22, 2008, at which Plaintiff, who was represented by counsel, appeared and testified, as did vocational expert ("VE") Alan L. Ey.  (AR 30-57.)  In a written decision issued September 22, 2008, ALJ Gaye found that Plaintiff was not disabled.  (AR 150-58.)  On May 21, 2009, the Appeals Council granted Plaintiff's request for review, vacated the hearing decision, and remanded the case for further review.  (AR 159-62.)

Another hearing was held, before ALJ David M. Ganly, on August 26, 2009, at which Plaintiff, who was represented by counsel, appeared and testified.  (AR 58-95.)  A medical expert, Dr. Samuel Landau, and VE David A. Rinehart also appeared and testified.  (<u>Id.</u>)  In a written decision issued October 27, 2009, ALJ Ganly found that Plaintiff was not disabled.  (AR 166-73.)  On June 22, 2010, the Appeals Council again granted Plaintiff's

2

1  request for review, vacated the hearing decision, and remanded
2  the case for further review.  (AR 174-76.)

3      A third hearing was held, before ALJ Ganly, on November 30,
4  2010, at which Plaintiff, who was represented by counsel,
5  appeared and testified.[2]  (AR 96-130.)  Also appearing and
6  testifying were medical expert Landau; psychological expert
7  Joseph Malancharuvil, Ph.D.; and VE Sandra M. Fioretti.  (Id.)
8  In a written decision issued February 4, 2011, ALJ Ganly found
9  that Plaintiff was not disabled.[3]  (AR 14-24.)  On December 20,
10 2011, the Appeals Council denied Plaintiff's request for review.
11 (AR 1-5.)  This action followed.

12 **III. STANDARD OF REVIEW**

13      Pursuant to 42 U.S.C. § 405(g), a district court may review
14 the Commissioner's decision to deny benefits.  The ALJ's findings
15 and decision should be upheld if they are free of legal error and
16 supported by substantial evidence based on the record as a whole.
17 § 405(g); Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct.
18 1420, 1427, 28 L. Ed. 2d 842 (1971); Parra v. Astrue, 481 F.3d

---

20      [2]   The ALJ stated that Plaintiff had a "non-attorney
21 representative" (AR 14) but the record reflects that his
   representative was in fact an attorney (AR 216).

22

23      [3]   At the August 2008 hearing, Plaintiff, through counsel,
   withdrew his DIB claim and amended his onset date to the date of
24 his application, November 29, 2005.  (AR 35-37.)  In the
   September 2008 decision, the ALJ noted Plaintiff's stipulation
25 and considered only Plaintiff's entitlement to SSI.  (AR 150-58.)
   In the two subsequent decisions, however, the ALJ considered
26 Plaintiff's entitlement to both DIB and SSI and stated that
   Plaintiff's onset date was November 15, 1999.  (AR 14-24, 166-
27 73.)  These discrepancies are inconsequential, however, given
   that the ALJ's ultimate disability determination is entitled to
28 affirmance.

1  742, 746 (9th Cir. 2007).  Substantial evidence means such

2  evidence as a reasonable person might accept as adequate to

3  support a conclusion.  <u>Richardson</u>, 402 U.S. at 401; <u>Lingenfelter</u>

4  <u>v. Astrue</u>, 504 F.3d 1028, 1035 (9th Cir. 2007).  It is more than

5  a scintilla but less than a preponderance.  <u>Lingenfelter</u>, 504

6  F.3d at 1035 (citing <u>Robbins v. Soc. Sec. Admin.</u>, 466 F.3d 880,

7  882 (9th Cir. 2006)).  To determine whether substantial evidence

8  supports a finding, the reviewing court "must review the

9  administrative record as a whole, weighing both the evidence that

10 supports and the evidence that detracts from the Commissioner's

11 conclusion."  <u>Reddick v. Chater</u>, 157 F.3d 715, 720 (9th Cir.

12 1996).  "If the evidence can reasonably support either affirming

13 or reversing," the reviewing court "may not substitute its

14 judgment" for that of the Commissioner.  <u>Id.</u> at 720-21.

15 **IV.  THE EVALUATION OF DISABILITY**

16      People are "disabled" for purposes of receiving Social

17 Security benefits if they are unable to engage in any substantial

18 gainful activity owing to a physical or mental impairment that is

19 expected to result in death or which has lasted, or is expected

20 to last, for a continuous period of at least 12 months.  42

21 U.S.C. § 423(d)(1)(A); <u>Drouin v. Sullivan</u>, 966 F.2d 1255, 1257

22 (9th Cir. 1992).

23      A.  <u>The Five-Step Evaluation Process</u>

24      The ALJ follows a five-step sequential evaluation process in

25 assessing whether a claimant is disabled.  20 C.F.R.

26 §§ 404.1520(a)(4), 416.920(a)(4); <u>Lester v. Chater</u>, 81 F.3d 821,

27 828 n.5 (9th Cir. 1995) (as amended Apr. 9, 1996).  In the first

28 step, the Commissioner must determine whether the claimant is

4

currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim must be denied. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If the claimant is not engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting his ability to do basic work activities; if not, a finding of not disabled is made and the claim must be denied. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R., Part 404, Subpart P, Appendix 1; if so, disability is conclusively presumed and benefits are awarded. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient residual functional capacity ("RFC")[4] to perform his past work; if so, the claimant is not disabled and the claim must be denied. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). The claimant has the burden of proving that he is unable to perform past relevant work. Drouin, 966 F.2d at 1257. If the claimant meets that burden, a prima facie case of

---

[4] RFC is what a claimant can still do despite existing exertional and nonexertional limitations. 20 C.F.R. §§ 404.1545, 416.945; see Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

1  disability is established.  _Id._  If that happens or if the
2  claimant has no past relevant work, the Commissioner then bears
3  the burden of establishing that the claimant is not disabled
4  because he can perform other substantial gainful work available
5  in the national economy.  §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).
6  That determination comprises the fifth and final step in the
7  sequential analysis.  §§ 404.1520, 416.920; _Lester_, 81 F.3d at
8  828 n.5; _Drouin_, 966 F.2d at 1257.

9          B.  The ALJ's Application of the Five-Step Process

10         At step one, the ALJ found that Plaintiff had not engaged in
11 any substantial gainful activity since November 15, 1999.  (AR
12 16.)  At step two, the ALJ concluded that Plaintiff had the
13 severe impairments of "hepatitis B and a healed hepatitis C
14 infection; chronic kidney disease stage one; healed bacterial
15 endocarditis; psoriasis; depressive disorder, not otherwise
16 specified; psychophysical reactions with chronic pain;
17 personality disorder, not otherwise specified; and history of
18 substance addiction, on methadone for maintenance."  (AR 16-17.)
19 At step three, the ALJ determined that Plaintiff's impairments
20 did not meet or equal any of the impairments in the Listing.  (AR
21 17.)  At step four, the ALJ found that Plaintiff retained the RFC
22 to perform "a range of light work."  (AR 18.)  Based on the VE's
23 testimony, the ALJ concluded that Plaintiff could not perform his
24 past work as an electrician but could perform jobs that existed
25 in significant numbers in the national economy.  (AR 22-23.)
26 Accordingly, the ALJ determined that Plaintiff was not disabled.
27 (AR 23-24.)
28

## V.   RELEVANT FACTS

From July 31 to August 8, 2005, Plaintiff was hospitalized with primary diagnoses of "febrile illness," bacteremia, and "rule out" meningitis and secondary diagnoses of hepatitis C and heroin dependence. (AR 605-18.) At discharge, Plaintiff's disability status was noted as "no disability." (AR 605.)

On August 19, 2005, a Riverside County Regional Medical Center ("RCRMC") doctor noted that Plaintiff's bacteremia was resolved and he was "doing well except for occasional severe headache." (AR 421.) The doctor noted that Plaintiff had been using heroin occasionally for pain relief and was interested in detox. (Id.)

From October 25 to November 14, 2005, Plaintiff was hospitalized with primary diagnoses of acute renal failure, fevers, and "rule out" endocarditis and secondary diagnoses of hepatitis C and B, left-arm cellulitis, hypertension, and anemia. (AR 550-604.) At discharge, Plaintiff's disability status was noted to be "[n]o disability." (AR 550.)

From November 18 to December 5, 2005, Plaintiff was hospitalized with primary diagnoses of methicillin-resistant staphylococcus aureus ("MRSA") and bacteremia and secondary diagnoses of infective endocarditis, chronic renal failure, anemia, and hypertension.[5] (AR 427-98, 533-49.) At discharge,

---

[5]   "MRSA is a 'staph' germ that does not get better with the first-line antibiotics that usually cure staph infections." MRSA, PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0004520/ (last updated Apr. 9, 2012). "Endocarditis is inflammation of the inside lining of the heart chambers and heart valves (endocardium)." Endocarditis, PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0002088/ (last

1  Plaintiff was "stable with normal temperature and stable BUN &
2  creatinine."[6]  (AR 427.)

3      On December 8, 2005, an RCRMC doctor noted that Plaintiff
4  had infective endocarditis, MRSA, bacteremia, a skin infection,
5  gastroesophageal disease, chronic anemia, and acute renal
6  failure.  (AR 419-20.)  The doctor noted that Plaintiff was
7  "doing good" and had stable "BUN/creatinine."  (Id.)  On January
8  6, 2006, an RCRMC doctor noted that Plaintiff's infective
9  endocarditis was improved.  (AR 417-18.)

10     On February 23, 2006, an RCRMC doctor assessed Plaintiff
11 with a history of MRSA, endocarditis, hepatitis B and C,
12 intravenous drug use, gastroesophageal reflux disease, and
13 tobacco abuse; the doctor also noted that Plaintiff had suffered
14 "renal failure while in hospital."  (AR 415.)  The doctor found
15 that Plaintiff's hepatitis C viral load was "not detectable."
16 (AR 416.)

17     On March 30, 2006, an RCRMC doctor noted that Plaintiff was
18 "feeling well" and had a history of hepatitis C, anemia, and
19 endocarditis.  (AR 413.)  On April 20, 2006, a lab report showed
20 that Plaintiff's hepatitis C viral load was less than 50, which
21 was within the normal reference range.  (AR 422.)  Plaintiff

22
23 updated July 16, 2012).

24     [6]    BUN stands for blood urea nitrogen.  BUN - blood test,
25 MedlinePlus, http://www.nlm.nih.gov/medlineplus/ency/article
   /003474.htm (last updated May 30, 2011).  A BUN test is often
26 done to check kidney function.  Id.  Creatinine is a breakdown
   product of creatine, which is an important part of muscle.
27 Creatinine - blood, MedlinePlus, http://www.nlm.nih.gov/
   medlineplus/ency/article/003475.htm (last updated Aug. 20, 2011).
28 A creatinine test also checks kidney function.  Id.

8

tested positive for hepatitis B.  (AR 423.)  On April 26, 2006, an RCRMC doctor noted that Plaintiff "doesn't have hep C based on viral load" but "does have" hepatitis B.  (AR 413.)

On July 12, 2006, an RCRMC doctor noted that Plaintiff had MRSA and endocarditis, hepatitis C with an "RNA" of less than 50,[7] hepatitis B, normal liver function tests, and improved "ARF," or acute renal failure.  (AR 411-12.)  Plaintiff was given "disability" for one month.  (AR 411.)

On October 6, 2006, an RCRMC doctor noted that Plaintiff had a history of hepatitis B and C infection, endocarditis, chronic renal insufficiency, and MRSA infection; the doctor also noted that Plaintiff had recently started "using" again because the Riverside methadone clinic had closed.  (AR 410.)

On October 18, 2006, Dr. Shahram Pourrabbani, a "Board Eligible Internist," examined Plaintiff at the Social Security Administration's request.  (AR 499-503.)  Dr. Pourrabbani found that Plaintiff had "hepatomegaly with the liver palpated approximately 8-cm below the costal margin."[8]  (AR 501.) Plaintiff had normal range of motion of the neck, back, shoulders, elbows, wrists, hands, hips, and knees; a negative straight-leg-raising test; and a normal gait.  (AR 501-03.)  He had "mild tenderness on abduction of the right shoulder past approximately 75 [degrees]," mild decrease in grip strength in

---

[7]    A blood test for Hepatitis C RNA measures a person's viral load.  Hepatitis C, PubMed Health, http://www.ncbi.nlm. nih.gov/pubmedhealth/PMH0001329/ (last updated Oct. 16, 2011).

[8]    Hepatomegaly is swelling of the liver beyond its normal size.  Hepatomegaly, MedlinePlus, http://www.nlm.nih.gov/ medlineplus/ency/article/003275.htm (last updated May 22, 2011).

both hands, and "mild edema/euthesitis" on the joints of the
fingers and hands. (AR 502.) Dr. Pourrabbani diagnosed
psoriasis with possible psoriatic arthritis and "rule out"
hepatitis B and C. (AR 503.) He opined that Plaintiff could
lift or carry 50 pounds occasionally and 25 pounds frequently,
stand or walk for approximately six to eight hours, and sit for
six to eight hours. (<u>Id.</u>) Dr. Pourrabbani found that Plaintiff
had no postural, visual, communicative, or environmental
limitations, but he did have "mild manipulative limitation
including reaching above the head as well as fine manipulations
with above head [sic]." (<u>Id.</u>)

On November 3, 2006, consulting physician M.A. Mazuryk
reviewed Plaintiff's medical records and completed a physical RFC
assessment. (AR 506-10.) Dr. Mazuryk stated that Plaintiff's
primary diagnoses were hepatitis C and chronic fatigue, and his
secondary diagnoses were psoriatic arthritis and chronic renal
insufficiency. (AR 506.) Dr. Mazuryk opined that Plaintiff
could lift and carry 20 pounds occasionally and 10 pounds
frequently, stand and walk for a total of six hours in an eight-
hour day, and sit for about six hours in an eight-hour day. (AR
507.) Plaintiff could occasionally climb ramps, stairs, ladders,
ropes, and scaffolds; balance; stoop; kneel; crouch; and crawl.
(AR 508.) He could reach overhead with his right arm on a
"frequent basis" and had unrestricted use of his left arm. (<u>Id.</u>)
Dr. Mazuryk noted Dr. Pourrabbani's finding that Plaintiff was
able to perform medium work, but Dr. Mazuryk concluded that an
RFC for light work was more appropriate. (AR 510.)

On November 5, 2006, Dr. Romaldo R. Rodriguez, a "Board

10

Eligible Psychiatrist," examined Plaintiff at the Social Security
Administration's request. (AR 511-16.) Dr. Rodriguez noted that
Plaintiff had been addicted to heroin, which he injected
intravenously, and had last used illegal drugs in May 2006.[9] (AR
512-13.) Plaintiff had never seen a psychiatrist, never taken an
antidepressant, and never been psychiatrically hospitalized. (AR
512.) Dr. Rodriguez noted that Plaintiff complained of being
depressed, angry, and irritated "because he keeps getting
rejected for Disability funds" but had "no interest in seeing
psychiatrists or psychologists." (AR 516.) Plaintiff reported
that he drove his own car, dressed and bathed himself, ran
errands, went to the store, cooked and made snacks, watched
television, and did yard work, gardening, and household chores.
(AR 513.) Plaintiff denied any significant outside activities
but said that he had "excellent" relationships with family,
friends, and neighbors and "good" relationships with others.
(Id.)

Upon examination, Dr. Rodriguez noted that Plaintiff was
"coherent and organized" and his affect was "polite and serious,"
not "sad or tearful." (AR 514.) Plaintiff was alert and
oriented and had at least average intelligence. (Id.) He could
recall three items immediately and after five minutes, perform
mathematical problems correctly and quickly, and spell the word
"world" forward and backward. (AR 514-15.) Dr. Rodriguez
diagnosed Plaintiff with "[p]olysubstance dependence, supposedly

---

[9]     This appears to be inconsistent with the October 2006
report by an RCRMC doctor that Plaintiff was "using again." (AR
410.)

in early sustained remission," with moderate psychosocial stressors over the past year, and assigned a global assessment of functioning score ("GAF") of 70.[10]  (AR 515.)  Dr. Rodriguez found that Plaintiff was "basically stable without any psychiatric medications" and had "no functional limitations." (AR 516.)

On November 9, 2006, consulting psychiatrist K.J. Loomis reviewed Plaintiff's medical records and completed a psychiatric review technique form.  (AR 517-27.)  Dr. Loomis noted that Plaintiff had a mood disorder by history, anxiety disorder by history, and polysubstance abuse/dependence.  (AR 517-23.)  Dr. Loomis found that Plaintiff's mental condition resulted in no restriction of activities of daily living; no difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation.  (AR 525.)  Dr. Loomis concluded that Plaintiff's mental impairments were not severe.  (AR 517.)

On June 25, 2007, Dr. Nasa Valentine completed a multiple impairment questionnaire, stating that the date of Plaintiff's last exam was June 20, 2007, and that his date of first treatment

---

[10]    A GAF score represents a rating of overall psychological functioning on a scale of 0 to 100.  See Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Disorders, Text Revision 34 (4th ed. 2000).  A GAF score in the range of 61 to 70 indicates "[s]ome mild symptoms (e.g. depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g. occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  Id.

was "10-07."[11]   (AR 629-36.)  Dr. Valentine, whose specialty was "family medicine," listed Plaintiff's diagnoses as fatigue, high blood pressure, psoriasis, hepatitis B and C, and chronic low-back pain.  (AR 629.)  Under "clinical findings" Dr. Valentine wrote "negative straight leg raise" and noted that Plaintiff's lumbar spine was positive for "TTP" — presumably, tenderness to palpation.[12]   (AR 629.)  Under "laboratory and diagnostic test results," Dr. Valentine wrote "positive for hepatitis B & C." (AR 630.)  Dr. Valentine listed Plaintiff's "primary symptom[]" as "fatigue" and stated that Plaintiff had "constant[]" body and joint pain in his hands, arms, legs, back, and neck.  (AR 630-31.)  Dr. Valentine listed arthritis, psoriasis, and hepatitis B and C as factors precipitating or relating to Plaintiff's pain. (AR 631.)  He estimated that Plaintiff's pain was a seven or eight out of 10 and his fatigue was an eight or nine out of 10. (Id.)  Dr. Valentine opined that Plaintiff could sit for two hours and stand or walk for one hour in an eight-hour day.  (Id.) He needed to get up and move each hour and could sit again after 15 minutes.  (AR 631-32.)  Plaintiff could lift or carry five pounds frequently and 20 pounds occasionally, but he could never

---

[11]    The questionnaire appears to have been filled out by someone, presumably Plaintiff, and then edited by Dr. Valentine, who crossed out several answers, writing "error" and his initials, and added to other answers.  (See AR 629-36.)  Dr. Valentine apparently signed the form.  (AR 636.)

[12]    Plaintiff asserts that Dr. Valentine listed "clinical findings of lumbar tenderness to palpation" (J. Stip. at 10), and the Court presumes he refers to the TTP acronym because a finding of tenderness to palpation does not appear elsewhere on the questionnaire (see AR 629-36).

1   lift or carry more than 20 pounds.  (AR 632.)  Dr. Valentine

2   stated that repetitive motions caused Plaintiff "severe pain" and

3   that he was moderately limited in his ability to grasp, turn, or

4   twist objects; use his fingers or hands for fine manipulations;

5   and use his arms for reaching.  (AR 632-33.)

6       Dr. Valentine believed that Plaintiff's symptoms would

7   "frequently" interfere with his attention and concentration and

8   that depression contributed to the severity of his symptoms and

9   functional limitations.  (AR 634.)  He said that Plaintiff would

10  be absent from work more than three times a month because of his

11  impairments or treatment; he needed to avoid fumes, gases,

12  temperature extremes, and heights; and he could not push, pull,

13  kneel, bend, or stoop.  (AR 635.)  When asked whether his patient

14  was a malingerer, Dr. Valentine wrote "unknown."  (AR 634.)

15      On October 1, 2007, Dr. Antonio A. Tan assessed Plaintiff

16  with hypertension, hyperlipidemia, and degenerative joint disease

17  of the neck.  (AR 622.)  On November 1, 2007, Dr. Tan wrote a

18  note stating that in his "best medical opinion" Plaintiff was

19  "totally disabled without consideration of any past or present

20  drug and/or alcohol use" and that "[d]rug and/or alcohol use is

21  not the material cause of this individual's disability."[13]  (AR

22  618.)

23

24      [13]   In the September 2008 decision, the ALJ stated that Dr.
25  Tan's report was dated November 1, 2007.  (AR 154 (referring to
    agency exhibit B9F).)  In the May 2009 order granting review and
26  remanding the case to the ALJ, however, the Appeals Council
    referred to the report as being dated April 1, 2007.  (AR 160
27  (referring to agency exhibit B9F).)  The Court, like the ALJ,
    finds that the report was dated November 1, 2007, as that is the
28  date the handwritten note most resembles.  (See AR 618.)

                                14

1    On January 8, 2008, Dr. Tan noted that Plaintiff had left-
2  foot pain and a nonhealing ulcer on his left leg.  (AR 621.)  On
3  March 7, 2008, Dr. Tan noted that Plaintiff was doing well and
4  that the wound on his left leg was healing.  (AR 645.)  On April
5  9, 2008, Dr. Tan noted that Plaintiff complained of bilateral leg
6  pain and had poor ambulation; he was still on methadone and had a
7  nonhealing ulcer on his left leg.  (AR 644.)  In a 2008 note with
8  an illegible month and day, Dr. Tan noted that Plaintiff was
9  having a "flare up" of psoriasis on his arms and legs, his blood
10 pressure was well controlled, and his ulcer was about the same.
11 (AR 643.)  In another 2008 note with an illegible month and day,
12 Dr. Tan noted that Plaintiff was having "ongoing pain" in his
13 left leg, his blood pressure was well controlled, and he had a
14 "bad fungal infection" on his fingernails.  (AR 642.)

15    On October 9, 2008, Dr. Tan noted that Plaintiff had a cyst
16 on his neck and complained of bilateral shoulder pain and back
17 pain; Dr. Tan ordered x-rays.  (AR 656.)  On October 27, 2008,
18 Dr. Tan noted that Plaintiff had cellulitis on the left side of
19 his face.  (AR 655.)  On January 5, 2009, an x-ray of Plaintiff's
20 lumbar spine showed "[s]pondylolisthesis with osteopenia greater
21 than expected for age."[14]  (AR 652.)  X-rays of Plaintiff's
22 shoulders were normal.  (AR 653-54.)  On January 13, 2009, Dr.
23 Tan noted that Plaintiff had low-back pain and a nonhealing ulcer
24 on his left leg.  (AR 651.)  On April 2, 2009, Dr. Tan noted that

25

26    [14]    "Spondylolisthesis is a condition in which a bone
27 (vertebra) in the spine slips out of the proper position onto the
   bone below it."  Spondylolisthesis, PubMed Health, http://www.
28 ncbi.nlm.nih.gov/pubmedhealth/PMH0002240/ (last updated Aug. 11,
   2012).

Plaintiff was "relatively stable" and that his leg ulcer was healing with no sign of infection.  (AR 650.)  On July 7, 2009, Dr. Tan noted that Plaintiff was complaining of "worsening back pain" and was "getting very depressed."  (AR 648.)  Dr. Tan reviewed an x-ray of Plaintiff's back and diagnosed backache and depression.  (AR 648-49.)

On July 31, 2009, Dr. Tan noted that Plaintiff had arrived at his appointment "with the intention of having me fill out the form for his disability," which was an issue that "had been discussed with him in the past."  (AR 667.)  Dr. Tan stated that he would not be able to complete the form "due to detailed information needed."  (Id.)  He noted that Plaintiff "got very belliger[e]nt and very rude" and "stormed out of the office talking obscenities."  (Id.)  Dr. Tan terminated Plaintiff from his services.  (Id.)

On August 28, 2009, Dr. Mohammed Ibrahaim noted that Plaintiff had a history of hepatitis B and C, psoriasis, chronic back pain, shoulder pain, and "DJD," or degenerative joint disease, of the spine.  (AR 676.)  On September 28, 2009, Dr. Ibrahaim assessed Plaintiff with hepatitis C, hyperlipidemia, and DJD.  (AR 675.)  On November 24, 2009, Dr. Ibrahaim noted that Plaintiff had a history of hepatitis and psoriasis and assessed him with DJD.  (AR 674.)  On December 22, 2009, Dr. Ibrahaim again noted DJD.  (AR 673.)  On September 2, 2010,[15] Dr. Ibrahaim noted that Plaintiff complained of "kidney stone" and psoriasis; he prescribed Dovonex cream and referred Plaintiff to

---

[15]    Plaintiff apparently did not see any doctor in the nine months between December 2009 and September 2010.

dermatology.  (AR 672.)

On October 13, 2010, Dr. Joseph Nassir, who specialized in internal medicine, completed a multiple impairment questionnaire and dictated a report.  (AR 681-92.)  Dr. Nassir, who had never before seen Plaintiff (AR 681), performed a one-and-a-half-hour examination and a medical-records review before diagnosing Plaintiff with back pain with lumbar radioculopathy, status-post motor vehicle accident in 1989 with right femur fracture and rod placement, hepatitis B and C secondary to intravenous heroin abuse in the past, weakness, fatigue, psoriasis with psoriatic arthritis, insomnia, depression, anxiety, methadone therapy, migraine headache, gastroesphageal disease, kidney stones, gallstones, constipation, impotence with erectile dysfunction, benign prostatic hyperplasia, neck pain with stiffness, bilateral shoulder bursitis, wrist pain with carpal tunnel syndrome on the right, acquired history of endocarditis, chronic renal insufficiency, and anemia (AR 681, 690-61).

In his dictated report, Dr. Nassir stated that Plaintiff had a history of psoriasis and hypertension and had been "involved in a motor vehicle accident in 1989," which apparently resulted in a right-femur fracture and subsequent surgical repair.  (AR 690.)  Dr. Nassir noted that a physical exam revealed "psoriatic breakouts of rashes throughout the body, more prominent on the extensor surfaces of the body," that appeared to be "somewhat in remission."  (AR 691.)  He noted that Plaintiff had decreased range of motion in both shoulders secondary to bursitis, right worse than left, and was showing "signs and symptoms of the carpal tunnel syndrome in the upper extremities, more prominent

on the right than on the left side." (Id.)  Dr. Nassir found

that Plaintiff had "stiffness of the neck with decreased neck

movement" and "lower back and right hip and femur movement

secondary to surgery." (Id.)  He noted that Plaintiff had pain

in his neck, back, right femur, and hand and arm joints secondary

to psoriatic arthritis. (Id.)  Dr. Nassir noted that Plaintiff

was "eliciting neuro symptoms" in the lower extremities, more on

the right than left. (Id.)  He opined that Plaintiff's medical

conditions prevented him from performing "required daily personal

needs" or any daily work activities and that Plaintiff should be

considered disabled. (AR 692.)

In the questionnaire, Dr. Nassir estimated Plaintiff's pain

to be a seven or eight out of 10 and his fatigue to be an eight

out of 10. (AR 683.)  Dr. Nassir opined that Plaintiff could sit

for one hour and stand or walk for zero to one hour in an eight-

hour day and must get up and move around for 10 to 15 minutes

every 45 to 60 minutes. (AR 683-84.)  Plaintiff could lift and

carry five pounds frequently and 20 pounds occasionally but never

more than that. (AR 684.)  Dr. Nassir believed that Plaintiff

was moderately limited in his ability to use his arms for

reaching, including overhead reaching, and he was markedly

limited in his ability to grasp, turn, or twist objects or

perform fine manipulations. (AR 684-85.)  Dr. Nassir believed

that Plaintiff's symptoms would increase if he were placed in a

competitive work environment. (Id.)  Dr. Nassir stated that

Plaintiff "constantly" experienced pain, fatigue, or other

symptoms severe enough to interfere with attention and

concentration. (AR 686.)  He believed that depression and

anxiety contributed to Plaintiff's symptoms and functional
limitations but that Plaintiff was able to tolerate low work
stress.  (Id.)

     Dr. Nassir opined that Plaintiff would miss more than three
days of work a month because of his impairments or treatment and
needed to avoid wetness, fumes, gases, temperature extremes,
humidity, and heights.  (AR 687.)  He stated that Plaintiff had
limited vision and could not push, pull, kneel, bend, or stoop.
(Id.)  Dr. Nassir believed that the earliest date that his
descriptions of Plaintiff's symptoms and limitations applied was
December 2003.  (Id.)

     On November 30, 2010, at Plaintiff's third hearing before an
ALJ, psychologist Malancharuvil noted that he had reviewed the
psychological evidence.  (AR 103.)  He then questioned Plaintiff
before testifying that he had a depressive disorder, not
otherwise specified; psychological reactions with chronic pain;
and personality disorder not otherwise specified.  (AR 103-06.)
Malancharuvil opined that Plaintiff's mental impairments resulted
in mild limitations in performing activities of daily living;
mild to moderate limitations in social functioning; and moderate
limitations in persistence and pace.  (AR 106-07.)  He believed
that Plaintiff should be limited to "moderately complex tasks"
with up to five-step instructions and "routine work that does not
change constantly," and that Plaintiff should be precluded from
"safety operations," very fast-paced work, and operating
hazardous or fast-moving machinery.  (Id.)

     Dr. Landau, who was board certified in internal medicine and
cardiovascular disease (AR 63), testified that he had reviewed

19

all the medical evidence and that Plaintiff suffered from
hepatitis B, "healed hepatitis C infection," chronic stage-one
kidney disease, healed bacterial endocarditis, psoriasis, and a
psychiatric diagnosis (AR 114-15).  Dr. Landau noted that
Plaintiff's psoriasis had never been "aggressively" treated with
a systemic medication and that there was "really no objective
evidence" of psoriatic arthritis.  (AR 115-16.)  He noted that
Plaintiff complained of chronic back pain and that lumbar-spine
x-rays showed spondylolisthesis and osteopenia but "no
significant arthritis."  (AR 115.)  He noted that Plaintiff
complained of shoulder pain but x-rays were normal.  (Id.)  Dr.
Landau opined that Plaintiff should be limited to two hours of
standing and walking in an eight-hour day but had no limitations
on sitting.  (AR 117.)  Plaintiff could lift and carry 10 pounds
frequently and 20 pounds occasionally, occasionally stoop and
bend, and occasionally operate foot pedals and controls.  (Id.)
Plaintiff could climb stairs but could not climb ladders,
balance, operate heavy equipment, or work around unprotected
machinery.  (Id.)  Plaintiff's work environment should be air
conditioned.  (Id.)

     In his written decision dated February 4, 2011, the ALJ
found that Plaintiff retained the RFC to perform "a range of
light work."  (AR 18.)  Specifically, Plaintiff could

          stand/walk 2 hours in an 8 hour workday with normal
          breaks such as every 2 hours; sit 8 hours in an 8 hour
          workday with normal breaks; lift/carry 10 pounds
          frequently, 20 pounds occasionally; occasionally stoop
          and bend; no ladders, work at heights, or balance;

20

1   occasional operation of foot controls or pedals; he

2   cannot operate motorized equipment or work around

3   unprotected machinery; his work environment should be air

4   conditioned; he can perform moderately complex tasks, up

5   to 4-5 steps, which should be habituated; no

6   responsibility for the safety of others; no fast paced

7   work; and no work around machinery.

8  (Id.)  In so finding, the ALJ accorded little weight to Drs.

9  Tan's, Valentine's, and Nassir's assessments and instead relied

10 upon the opinions of Dr. Landau and psychologist Malancharuvil.

11 (AR 20-22.)

12 **VI.  DISCUSSION**

13      Plaintiff alleges that the ALJ erred in (1) failing to give

14 "proper weight" to the functional-capacity opinions of Drs.

15 Valentine and Nassir and (2) finding that Plaintiff's subjective

16 complaints were not fully credible.  (J. Stip. at 7.)

17      A.   The ALJ Properly Evaluated the Medical Evidence

18      Plaintiff contends that the ALJ failed to properly consider

19 the opinions of treating physician Valentine and examining

20 physician Nassir.  (J. Stip. at 8-14.)  Remand is not warranted

21 on that basis, however, because the ALJ provided legally

22 sufficient reasons for according little weight to those opinions.

23      Three types of physicians may offer opinions in social

24 security cases: "(1) those who treat[ed] the claimant (treating

25 physicians); (2) those who examine[d] but d[id] not treat the

26 claimant (examining physicians); and (3) those who neither

27 examine[d] nor treat[ed] the claimant (non-examining

28 physicians)."  Lester, 81 F.3d at 830.  A treating physician's

21

opinion is generally entitled to more weight than the opinion of a doctor who examined but did not treat the claimant, and an examining physician's opinion is generally entitled to more weight than that of a nonexamining physician.   Id.

The opinions of treating physicians are generally afforded more weight than the opinions of nontreating physicians because treating physicians are employed to cure and have a greater opportunity to know and observe the claimant.   Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996).  If a treating physician's opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record, it should be given controlling weight.   20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). If a treating physician's opinion is not given controlling weight, its weight is determined by length of the treatment relationship, frequency of examination, nature and extent of the treatment relationship, amount of evidence supporting the opinion, consistency with the record as a whole, the doctor's area of specialization, and other factors.   20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6).

When a treating or examining doctor's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing" reasons.   Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1164 (9th Cir. 2008) (quoting Lester, 81 F.3d at 830-31).  When a treating or examining physician's opinion conflicts with another doctor's, the ALJ must provide only "specific and legitimate reasons" for discounting the treating doctor's opinion.   Id.  Indeed, the ALJ "need not accept

22

the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings." Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002); accord Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1195 (9th Cir. 2004).  The weight given an examining physician's opinion, moreover, depends on whether it is consistent with the record and accompanied by adequate explanation, among other things.  20 C.F.R. §§ 404.1527(c)(3)-(6), 416.927(c)(3)-(6).

> ## 1.   Dr. Valentine's opinion

Plaintiff refers to Dr. Valentine as his "treating family practitioner" (J. Stip. at 8), but the record fails to establish that Dr. Valentine ever treated Plaintiff.  Rather, it appears that Dr. Valentine merely reviewed and signed a form that had been completed by someone else, presumably Plaintiff.  (See AR 629-36.)  Even assuming that Dr. Valentine was a treating source, however, the ALJ properly considered his sparse — or perhaps nonexistent — treatment of Plaintiff when determining that his opinion should be accorded less weight.  (AR 20); see Orn v. Astrue, 495 F.3d 625, 631 (9th Cir. 2007) (factors in assessing treating physician's opinion include length of treatment relationship, frequency of examination, and nature and extent of treatment relationship); accord 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

On the questionnaire, Dr. Valentine listed Plaintiff's "[d]ate of first treatment" as "10-07," which, if interpreted to mean October 2007, would postdate the questionnaire by four months.  (AR 629.)  Dr. Valentine listed Plaintiff's last

examination date as June 20, 2007 — just five days before the questionnaire was completed — but he left blank the space for indicating "frequency of treatment" and wrote "unknown" as the earliest date to which his description of Plaintiff's condition applied.  (AR 629, 635.)  Moreover, none of the notes from the RCRMC, where Dr. Valentine worked, appear to have been completed by him (see AR 409-98, 533-616), and at the August 2008 hearing, Plaintiff testified that he thought he had "met" Dr. Valentine only once.[16]  (AR 49.)  The ALJ therefore permissibly discounted Dr. Valentine's opinion based on his apparently minimal or nonexistent treatment relationship with Plaintiff.

The ALJ was also entitled to discount Dr. Valentine's finding that Plaintiff had "extreme limitations" because it was "not supported by objective evidence or even Dr. Valentine's own treatment record."  (AR 20.)  Dr. Valentine cited Plaintiff's hepatitis B and C lab results, but as the ALJ noted (AR 170), those lab results actually partially undermined the doctor's assessment.[17]  Around the time that Dr. Valentine rendered his opinion, Plaintiff's hepatitis C viral load was undetectable, and one RCRMC doctor had noted that Plaintiff "doesn't have hep C based on viral load."  (AR 416, 422-23.)  The medical expert, Dr. Landau, also testified that Plaintiff "seem[ed] to have cleared"

---

[16]    Plaintiff also testified that he usually saw interns at RCRMC and that "nobody could seem to get on the same page with anything," which is why he switched to a new doctor.  (AR 49.)

[17]    Specifically, in the October 2009 decision, the ALJ noted that Dr. Valentine's hepatitis C findings were "incorrect as documented by the laboratory findings."  (AR 170.)  The October 2009 findings were incorporated into the February 2011 decision.  (AR 14.)

the hepatitis C virus and found that Plaintiff's hepatitis C
virus was "healed."  (AR 80, 85-86, 115.)  Dr. Valentine noted
that Plaintiff had a negative — or normal — straight-leg-raising
test, which also undermined his disability opinion.  (AR 629.)
Finally, Dr. Valentine stated that Plaintiff's lumbar spine was
positive for "TTP," presumably referring to tenderness to
palpation, but that seemingly mild finding does not support the
significant limitations he found — such as Plaintiff's inability
to sit for more than two hours or stand or walk for more than one
hour or his reduced ability to grasp or reach.

Plaintiff's other medical records also fail to support Dr.
Valentine's findings.  Although Plaintiff was hospitalized three
times for infections and kidney failure, those conditions
apparently largely resolved with treatment.  (See AR 605 (Aug.
2005 discharge note from hospitalization for "febrile illness"
listing disability status as "no disability"), AR 550 (Nov. 2005
discharge note from hospitalization for acute renal failure,
fevers, and "rule out" endocarditis listing disability status as
"no disability"); AR 427 (Dec. 2005 discharge note from
hospitalization for MRSA and bacteremia, Plaintiff "stable with
normal temperature and stable BUN & creatinine").)  As the ALJ
and Dr. Landau noted (AR 21, 115), the objective evidence did not
establish that Plaintiff had arthritis; rather, x-rays of
Plaintiff's shoulders were normal, and an x-ray of Plaintiff's
lumbar spine showed only spondylolisthesis and osteopenia (AR
652-54).  Dr. Pourrabbani examined Plaintiff and found only mild
symptoms; he concluded, as did the nonexamining doctors, that
Plaintiff was far less limited than Dr. Valentine had found.  (AR

117, 501-03, 507-09.)

The ALJ also discounted Dr. Valentine's assessment because it appeared to be premised on Plaintiff's discredited subjective complaints.  Indeed, Plaintiff likely filled out the form himself and then gave it to Dr. Valentine to sign.  The ALJ noted, moreover, that Dr. Valentine found that Plaintiff had a pain level of seven or eight of 10, which was "an opinion that only [Plaintiff] could have given to Dr. Valentine" and was likely not based on objective testing.  (AR 20.)  When asked whether Plaintiff was a malingerer, Dr. Valentine answered "unknown," which also seems to indicate that he was relying on Plaintiff's own account of his symptoms rather than objective data.  (AR 634.)  As discussed, Dr. Valentine listed little evidence in support of his assessment, and some of the cited evidence failed to support his assessment.  Moreover, as discussed <u>infra</u> in subsection B, the ALJ gave legally sufficient reasons for discrediting Plaintiff's subjective symptom testimony to the extent it was inconsistent with the RFC assessment.  Dr. Valentine's apparently almost exclusive reliance on Plaintiff's subjective complaints was a specific and legitimate reason for according his opinion less weight.  <u>See</u> <u>Tonapetyan v. Halter</u>, 242 F.3d 1144, 1149 (9th Cir. 2001) (when ALJ properly discounted claimant's credibility, he was "free to disregard" doctor's opinion that was premised on claimant's subjective complaints); <u>Morgan v. Comm'r of Soc. Sec. Admin.</u>, 169 F.3d 595, 602 (9th Cir. 1999) (when physician's opinion of disability premised "to a large extent" upon claimant's own accounts of symptoms, limitations may be disregarded if complaints have been "properly

26

discounted").

The ALJ also noted that Dr. Valentine's assessment was a "checklist style disability questionnaire" and that he may not have reviewed Plaintiff's medical records before rendering his assessment. (AR 20.) Dr. Valentine left blank several of the spaces for explanation or further comment. (See AR 634 ("Please explain the basis for your conclusions"), 635 ("Additional comments").) Those are permissible reasons for according less weight to Dr. Valentine's statements. See Molina v. Astrue, 674 F.3d 1104, 1111 (9th Cir. 2012) (ALJ may permissibly reject check-off reports that do not contain explanation of basis for conclusions); Batson, 359 F.3d at 1195 ("an ALJ may discredit treating physicians' opinions that are conclusory, brief, and unsupported by the record as a whole . . . or by objective medical findings"); Crane v. Shalala, 76 F.3d 251, 253 (9th Cir. 1996) (ALJ permissibly rejected doctor's evaluations because they were check-off reports that did not contain explanation of bases for conclusions); 20 C.F.R. §§ 404.1527(c)(6) (extent to which doctor is familiar with record is relevant factor in deciding weight to give opinion), 416.927(c)(6) (same). The ALJ's conclusion that Dr. Valentine did not review Plaintiff's medical records is supported by the evidence. Dr. Valentine apparently "met" with Plaintiff only once before rendering his opinion, and it is unclear whether he actually treated him. When asked to list Plaintiff's laboratory results and treatments, Dr. Valentine stated only that Plaintiff had lumbar tenderness, was "positive for hepatitis B & C," and took the medications methadone and

1  clonidine.[18]  (AR 629-30.)  Dr. Valentine failed to mention any
2  other laboratory report, test, treatment, or hospitalization that
3  was reflected in Plaintiff's medical records.  (AR 630.)  He left
4  blank the question calling for a list of the patient's "other
5  treatment."  (AR 633.)  The ALJ was entitled to consider Dr.
6  Valentine's apparent unfamiliarity with the complete record when
7  determining how much weight to accord his opinion.

8       Finally, the ALJ was entitled to rely on testifying medical
9  expert Dr. Landau's opinion rather than Dr. Valentine's because
10  Dr. Landau's opinion was consistent with the objective evidence.
11  Thomas, 278 F.3d at 957 ("The opinions of non-treating or
12  non-examining physicians may also serve as substantial evidence
13  when the opinions are consistent with independent clinical
14  findings or other evidence in the record."); Morgan, 169 F.3d at
15  600 ("Opinions of a nonexamining, testifying medical advisor may
16  serve as substantial evidence when they are supported by other
17  evidence in the record and are consistent with it" (citing
18  Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995))); see 20
19  C.F.R. §§ 404.1527(c)(4), 416.927(c)(4) (ALJ will generally give
20  more weight to opinions that are "more consistent . . . with the
21  record as a whole").  For example, Dr. Landau noted that
22  Plaintiff's hepatitis C was "healed" and that no objective
23  evidence supported Plaintiff's diagnosis of psoriatic arthritis,
24  opinions that were, as previously discussed, consistent with the
25  evidence.  (AR 115-16.)  Dr. Landau also noted that the evidence

26
27       [18]    Clonidine is used to treat high blood pressure.
28  Clonidine, MedlinePlus, http://www.nlm.nih.gov/medlineplus/
    druginfo/meds/a682243.html#why (last updated Oct. 1, 2010).

did not support Plaintiff's claim that he had headaches two or
three times a week (AR 119); in fact, Drs. Tan (who treated
Plaintiff over a span of 20 months), Valentine, and Ibrahim (who
treated Plaintiff over a span of a year) all failed to note that
Plaintiff suffered from headaches, let alone frequent headaches
(see AR 618-22, 629-36, 642-46, 648-60, 667-70, 672-77), and
Plaintiff testified that his only medication for them was
naproxyn (AR 67), which is actually a nonsteroidal anti-
inflammatory drug.[19]

Moreover, Dr. Landau, unlike Dr. Valentine, reviewed all the
medical evidence up to the date of the hearing before rendering
his opinion.  (AR 114-15); see 20 C.F.R. §§ 404.1527(c)(6)
(extent to which doctor is "familiar with the other information
in [claimant's] case record" is relevant factor in determining
weight given to opinion), 416.927(c)(6) (same).  The ALJ could
also credit Dr. Landau's opinion because he testified at the
hearing, heard Plaintiff's testimony, and was subject to cross-
examination.  See Andrews, 53 F.3d at 1042 (greater weight may be
given to nonexamining doctors who are subject to
cross-examination).  Any conflict in the properly supported
medical-opinion evidence was the sole province of the ALJ to
resolve.  See id. at 1041.

The ALJ erred in finding that Dr. Valentine did not state
his area of specialization (AR 20) because on the questionnaire
he listed "family medicine" as his specialty (AR 636).  That

---

[19]   Naproxen, MedlinePlus, http://www.nlm.nih.gov/
medlineplus/druginfo/meds/a681029.html (last updated June 15,
2012).

1  error, however, was harmless in light of the ALJ's other specific
2  and legitimate reasons for rejecting Dr. Valentine's opinion and
3  the fact that a background in family medicine did not
4  particularly qualify Dr. Valentine to assess the severity of
5  Plaintiff's impairments.   See Carmickle, 533 F.3d at 1162–63.
6  Moreover, Dr. Landau was board-certified in internal medicine and
7  therefore at least as qualified as Dr. Valentine to render an
8  opinion on Plaintiff's conditions and functional limitations.
9  See 20 C.F.R. §§ 404.1527(c)(5) ("We generally give more weight
10 to the opinion of a specialist about medical issues related to
11 his or her area of specialty than to the opinion of a source who
12 is not a specialist."), 416.927(c)(5) (same); Smolen, 80 F.3d at
13 1285 (same).

14     Plaintiff is not entitled to reversal on this ground.

15          2.   Dr. Nassir's opinion

16     The ALJ rejected Dr. Nassir's opinion for several reasons,
17 all of which were legally sufficient and supported by substantial
18 evidence.

19     The ALJ was entitled to discount Dr. Nassir's opinion
20 because it was not supported by his own examination findings or
21 the objective medical evidence.   See Batson, 359 F.3d at 1195;
22 Thomas, 278 F.3d at 957.   The ALJ noted that Dr. Nassir
23 "refer[red] to a dictated report as the basis for his extreme
24 opinions on the questionnaire, yet the report does not contain
25 objective evidence or evidence supported by [Plaintiff's] records
26 for the extreme limitations opined by Dr. Nassir." (AR 20.) Dr.
27 Nassir's report states that he conducted a physical exam and that
28 Plaintiff had "psoriatic breakouts of rashes throughout the body"

30

1    that were "somewhat in remission"; "[d]ecreased" range of motion
2    in the shoulders, right greater than left; "signs and symptoms"
3    of carpal tunnel, right greater than left; "stiffness of the
4    neck"; "decreased neck movement as well as the lower back and
5    right hip and femur movement secondary to surgery"; "neuro
6    symptoms" in the lower extremities, right greater than left; and
7    "[w]eakness on the right side."  (AR 691.)  Although Dr. Nassir
8    found that Plaintiff had reduced ranges of motion, he failed to
9    state the degree or severity of those limitations.  Dr. Nassir
10   also simply referred to "symptoms" or "signs" of conditions,
11   without explaining what those symptoms and signs were.  Moreover,
12   under "diagnostic examination," Dr. Nassir wrote, "[p]lease refer
13   to [Plaintiff's] extensive medical records," without citing to
14   any particular evidence, test result, or clinical finding or
15   explaining how the records supported his conclusions.  (Id.)  The
16   ALJ reasonably concluded that Dr. Nassir's vague findings failed
17   to adequately support his conclusion that Plaintiff suffered from
18   extensive medical impairments that were so significant as to
19   preclude all work and self-care activity.  See 20 C.F.R.
20   §§ 404.1527(c)(3) (more weight accorded to opinion of medical
21   source who "presents relevant evidence to support an opinion,
22   particularly medical signs and laboratory findings," and provides
23   explanation for opinion), 416.927(c)(3) (same).

24        The ALJ also correctly noted that Plaintiff's "records do
25   not support a finding that [Plaintiff's] symptoms and extreme
26   limitations have been present since December 2003 as opined by
27   Dr. Nassir."  (AR 20.)  As previously discussed, the evidence did
28   not show that Plaintiff suffered from repeated migraine

headaches, and lab reports showed that Plaintiff's hepatitis C
viral load was undetectable.  (AR 416, 422-23.)  No objective
evidence established that Plaintiff had arthritis; rather, x-rays
of Plaintiff's shoulders were normal, and an x-ray of Plaintiff's
lumbar spine showed only spondylolisthesis and osteopenia.  (AR
652-54.)  Dr. Pourrabbani examined Plaintiff and found that
Plaintiff had, at most, mild symptoms as a result of his
impairments, and Drs. Pourrabbani and Valentine both noted that
Plaintiff had a negative — or normal — straight-leg test.  (AR
502-03, 629.)  That lack of objective evidence was a specific and
legitimate reason for rejecting Dr. Nassir's opinion that
Plaintiff had suffered from significant limitations since 2003.

        Further, the ALJ was permitted to discount Dr. Nassir's
finding of extreme limitations because they were inconsistent
with Plaintiff's own reported activities of daily living.  (AR
20-21.)  See Rollins v. Massanari, 261 F.3d 853, 856 (9th Cir.
2001) (ALJ's finding that doctor's "restrictions appear to be
inconsistent with the level of activity that [plaintiff] engaged
in by maintaining a household and raising two young children,
with no significant assistance from her ex husband" was specific
and legitimate reason for discounting opinion); Morgan, 169 F.3d
at 601-02 (ALJ permissibly rejected treating physician's opinion
when it conflicted with plaintiff's activities); see also Fisher
v. Astrue, 429 F. App'x 649, 652 (9th Cir. 2011) (conflict
between doctor's opinion and claimant's daily activities was
specific and legitimate reason to discount opinion).  Dr. Nassir,
who apparently saw Plaintiff only once, found that Plaintiff
could sit for only one hour and stand and walk for less than one

hour in an eight-hour day.  (AR 683.)  He believed Plaintiff's
medical problems would "constantly" interfere with his attention
and concentration and "not only prevent him from performing
required daily work activities" but also "required daily personal
needs."  (AR 686, 692.)  Dr. Nassir stated that the earliest date
his descriptions of Plaintiff's symptoms and limitations applied
was December 2003, more than seven years before his examination.
(AR 687.)  Dr. Nassir's assessments were inconsistent with
Plaintiff's reported activities of daily living, including
driving his own car, performing his own personal care, walking
his pets, going to the movies, shopping for groceries for two
hours at a time, doing his laundry, preparing simple meals,
performing light housework, doing yard work like pulling weeds
and watering, and playing cards or board games with friends a
couple times a week.  (AR 75-76, 341-45.)  Plaintiff originally
filled out a function report reporting these activities in late
2006 (AR 341-45), three years after the effective date of Dr.
Nassir's assessment, and at the August 2009 hearing, Plaintiff
reconfirmed that he was still doing most of these things (AR 75-
76).

     The ALJ also discounted Dr. Nassir's opinion because it
appeared to have been rendered solely for the purpose of
Plaintiff's Social Security claims.  (AR 21.)  "[I]n the absence
of other evidence to undermine the credibility of a medical
report, the purpose for which the report was obtained does not
provide a legitimate basis for rejecting it."  Reddick, 157 F.3d
at 726; accord Case v. Astrue, 425 F. App'x 565, 566 (9th Cir.
2011).  As discussed above, here the ALJ cited other evidence

33

1  that undermined the credibility of Dr. Nassir's report, and

2  consideration of the report's purpose was therefore appropriate.

3  Even if the ALJ's reliance on this factor was error, however, it

4  was harmless in light of the ALJ's other specific and legitimate

5  reasons for rejecting Dr. Nassir's report.  See Stout v. Comm'r,

6  Soc. Sec. Admin., 454 F.3d 1050, 1055 (9th Cir. 2006)

7  (nonprejudicial or irrelevant mistakes harmless).

8        Finally, as discussed above, the ALJ was entitled to rely on

9  Dr. Landau's opinion instead of Dr. Nassir's because it was

10  consistent with the objective evidence and because he testified

11  at the hearing and was subject to cross-examination.  Morgan, 169

12  F.3d at 600; Andrews, 53 F.3d at 1042.  Plaintiff is not entitled

13  to reversal on this ground.

14        B.   The ALJ Properly Assessed Plaintiff's Credibility

15        Plaintiff argues that the ALJ's decision should be reversed

16  because he found that Plaintiff was not fully credible but "never

17  set[] forth an analysis of [Plaintiff's] veracity" or

18  "explain[ed] specifically why [Plaintiff's] testimony of greater

19  limitations cannot be believed."  (J. Stip. at 19-20.)

20        An ALJ's assessment of pain severity and claimant

21  credibility is entitled to "great weight."  See Weetman v.

22  Sullivan, 877 F.2d 20, 22 (9th Cir. 1989); Nyman v. Heckler, 779

23  F.2d 528, 531 (9th Cir. 1986).  "[T]he ALJ is not required to

24  believe every allegation of disabling pain, or else disability

25  benefits would be available for the asking, a result plainly

26  contrary to 42 U.S.C. § 423(d)(5)(A)."  Molina, 674 F.3d at 1112

27  (internal quotation marks and citation omitted).  In evaluating a

28  claimant's subjective symptom testimony, the ALJ engages in a

34

two-step analysis.  See Lingenfelter, 504 F.3d at 1035-36.

"First, the ALJ must determine whether the claimant has presented

objective medical evidence of an underlying impairment [that]

could reasonably be expected to produce the pain or other

symptoms alleged."  Id. at 1036 (internal quotation marks

omitted).  If such objective medical evidence exists, the ALJ may

not reject a claimant's testimony "simply because there is no

showing that the impairment can reasonably produce the *degree* of

symptom alleged."  Smolen, 80 F.3d at 1282 (emphasis in

original).  When the ALJ finds a claimant's subjective complaints

not credible, the ALJ must make specific findings that support

the conclusion.  See Berry v. Astrue, 622 F.3d 1228, 1234 (9th

Cir. 2010).  Absent affirmative evidence of malingering, those

findings must provide "clear and convincing" reasons for

rejecting the claimant's testimony.  Lester, 81 F.3d at 834.  If

the ALJ's credibility finding is supported by substantial

evidence in the record, the reviewing court "may not engage in

second-guessing."  Thomas, 278 F.3d at 959.

     In a function report dated October 10, 2006, Plaintiff

stated that his daily activities included eating meals, watching

television, going to the store, going to the movies, and visiting

friends or family.  (AR 341.)  He took care of his mother by

cleaning the house and driving to appointments or the store.  (AR

342.)  He and his mother walked and fed their pets.  (Id.)  He

had no problems with personal care, prepared his own simple meals

every day, and shopped for food once a month for two hours at a

time.  (AR 342-44.)  He did laundry once a week for two hours,

light housekeeping for three or four hours a week, and "very

light" yard work for about two hours a week.  (AR 343.)  He went outside for "short periods" almost every day and traveled by walking or driving.  (AR 344.)  He watched television every day and played cards or board games a couple times a week.  (AR 345.) He spent time with others one or two times a week by visiting, playing games, or going to lunch or dinner.  (Id.)  He had no problems getting along with people.  (AR 346-47.)

Plaintiff stated that his conditions affected his ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, complete tasks, concentrate, and use his hands.  (AR 346.)  He could walk a half block or a block before needing to rest for five or 10 minutes.  (Id.)  He was not able to handle stress well and didn't like change.  (AR 347.)  Plaintiff stated that he tired easily and got headaches when he was under stress.  (AR 348.)

At the August 2008 hearing, Plaintiff testified that he could not work because he had "severe aches" throughout his joints, including his knees, hips, back, shoulders, wrists, and fingers, with the worst pain in his lower back and knees.  (AR 39, 45.)  Plaintiff tired "extremely fast" and became dizzy "at times," which would bring on "migraine headaches."  (AR 39, 44-45.)  He could not lift anything above shoulder height, and lifting anything of "substantial weight" caused pain.  (AR 39, 51.)  He had severe psoriasis on his scalp, elbows, arms, and legs and around his fingernails.  (AR 40-41.)  As a result, Plaintiff could not kneel or lean on his elbows and had problems gripping, grasping, and fingering.  (AR 41-42.)  Plaintiff testified that he could walk for only 10 to 15 minutes before

36

1    having to stop and rest for a few minutes; stand for 20 or 30
2    minutes before needing to sit down; and sit for 30 to 40 minutes
3    before needing to change positions.  (AR 49-50.)  He said he
4    could no longer climb ladders or scaffolding because he felt
5    unstable and fearful.  (AR 52.)

6        At the August 2009 hearing, Plaintiff testified that he was
7    unable to work because of fatigue and "extreme pain" in his
8    shoulders and back.  (AR 64.)  He said that his joints were
9    "constantly sore" but the pain was relieved by methadone.  (AR
10   64, 71.)  He said that he had psoriasis over a "large percentage"
11   of his body, which was painful, prevented him from kneeling, and
12   made sitting uncomfortable.  (AR 64-65.)  Plaintiff testified
13   that his psoriasis also affected his fingernails, which made it
14   painful to grab something with the tips of his fingers.  (AR 68-
15   69.)  He said he got migraine headaches "at least three to four
16   times a month," lasting two or three hours.  (AR 65, 67.)  He
17   "tire[d] very quickly" and would lie down four or five times a
18   day for about a half an hour at a time.  (AR 65, 71.)  He had to
19   reposition on a "pretty constant basis" because if he stayed in
20   one position for long "things seem to lock in that position."
21   (AR 65.)  Plaintiff testified he was unable to lift anything
22   above shoulder level and had difficulty reaching.  (AR 66, 72.)
23   He said he could lift about 15 pounds at most and about 10 pounds
24   frequently, walk for about 15 minutes before needing to rest, and
25   sit for about an hour, although he needed to "constantly"
26   reposition himself.  (AR 72-73, 79.)  Plaintiff had a driver's
27   license and was able to drive.  (AR 75.)  He lived with his
28   mother and would fix meals and grocery shop with her.  (AR 75-

76.)  Plaintiff dusted and did "a little yard work," like
watering and pulling weeds; he could work in the yard for about
half an hour before needing a break.  (AR 76, 79.)  He had no
problems taking care of his own hygiene or dressing himself.  (AR
78-79.)

     At the December 2011 hearing, Plaintiff testified that his
physical and psychiatric conditions had worsened and that he was
"constantly" depressed, which he believed affected his attention.
(AR 101-02, 109.)  Plaintiff was able to sleep for only two hours
at a time.  (AR 103.)  He had constant pain in his elbows, his
lower back and hips were painful 90% of the time, and he was
having two or three migraines a week.  (AR 109.)  He said that
his psoriasis had worsened and the skin on his elbows and knees
would crack and bleed.  (AR 110.)  He couldn't hold onto anything
with "any weight," and the dexterity in his fingers was reduced.
(AR 110-11.)  Plaintiff testified that he could be on his feet
for about half an hour before needing a break, and he had pain
when lifting a gallon of milk.  (AR 111-12.)

     Reversal is not warranted based on the ALJ's alleged failure
to make proper credibility findings or properly consider
Plaintiff's subjective symptoms.  Plaintiff argues that the ALJ
failed to give any reasons for his credibility determination, but
in the September 2008 decision, the ALJ clearly found that
Plaintiff had fatigue and "joint troubles" but that the degree of
his alleged symptoms and resulting limitations was "not
consistent with the objective studies and clinical findings, and
the range of his activities of living."  (AR 156.)  Those
findings, which Plaintiff does not challenge, were incorporated

38

into both later decisions (AR 14, 166) and supported the ALJ's ultimate conclusion that Plaintiff's subjective symptom testimony was not credible to the extent it was inconsistent with the assigned RFC (AR 19). Thus, the ALJ explicitly assessed Plaintiff's credibility and, as discussed below, gave clear and convincing reasons for his credibility determination.

First, the ALJ properly discredited Plaintiff's subjective complaints as inconsistent with his daily activities. See Molina, 674 F.3d at 1113 ("Even where [claimant's] activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment."); see also Thomas, 278 F.3d at 958-59 (inconsistency between claimant's testimony and conduct supported rejection of her credibility); Verduzco v. Apfel, 188 F.3d 1087, 1090 (9th Cir. 1999) (inconsistencies between claimant's testimony and actions clear and convincing reason for rejecting claimant's testimony). Plaintiff claimed he could not work because of fatigue and "severe aches" throughout his joints. (AR 39, 45, 52, 64-65, 71.) He said he had trouble concentrating, could walk for one block at most before needing to rest for five or 10 minutes, could not kneel, and had problems gripping, grasping, and fingering. (AR 41-42, 64-65, 346.) Nevertheless, as the ALJ noted, Plaintiff engaged in a "wide range of activities of daily living" (AR 19, 156): he drove his own car, performed personal care, walked his pets, went to the movies, shopped for groceries once a month for two hours at a time, did his own laundry, prepared simple meals, performed light housework, did yard work

1   like watering and pulling weeds, and played cards or board games

2   with friends a couple times a week (AR 75-76, 341-45).  Plaintiff

3   reconfirmed at the August 2009 hearing that he was still doing

4   most of these things, as he had first indicated in the October

5   2006 function report.  (AR 75-76.)  The ALJ reasonably concluded

6   that those activities were inconsistent with Plaintiff's claims

7   of total disability and consistent with an RFC for a limited

8   range of light work.  (AR 156.)

9        Second, the ALJ's finding that Plaintiff's alleged symptoms

10   were not supported by "objective studies and clinical findings"

11   was also a clear and convincing reason for discounting

12   Plaintiff's credibility.  See Carmickle, 533 F.3d at 1161

13   ("Contradiction with the medical record is a sufficient basis for

14   rejecting the claimant's subjective testimony."); Lingenfelter,

15   504 F.3d at 1040 (in determining credibility, ALJ may consider

16   "whether the alleged symptoms are consistent with the medical

17   evidence"); Burch v. Barnhart, 400 F.3d 676, 681 (9th Cir. 2005)

18   ("Although lack of medical evidence cannot form the sole basis

19   for discounting pain testimony, it is a factor that the ALJ can

20   consider in his credibility analysis."); Kennelly v. Astrue, 313

21   F. App'x 977, 979 (9th Cir. 2009) (same).  Throughout the three

22   decisions, the ALJ discussed the lack of objective support for

23   Plaintiff's subjective complaints.  The ALJ noted that

24   Plaintiff's condition had improved after he was hospitalized for

25   acute kidney failure in 2005.  (AR 155.)  The ALJ also correctly

26   noted that although Plaintiff complained of joint pains and

27   arthritis, Dr. Pourrabbani noted only "mild findings" in the

28   October 2008 exam, such as mild edema, mild shoulder tenderness

with abduction, mild deformities of the fingernails, and mildly decreased grip strength.  (Id.)  The ALJ noted that x-rays of Plaintiff's shoulders were normal, and an x-ray of Plaintiff's lumbar spine showed only spondylolisthesis and osteopenia.  (AR 170.)  The ALJ also noted that Plaintiff's records did not support his claims of constant migraines (AR 21); indeed, as previously noted, neither of Plaintiff's doctors who treated him for the longest periods, Drs. Tan and Ibrahim, had even noted any headache symptoms (AR 618-22, 642-46, 648-60, 667-70, 672-77). The ALJ therefore reasonably found that Plaintiff's complaints were not supported by the objective medical evidence.

Because the ALJ's credibility finding was supported by substantial evidence, the Court "may not engage in second-guessing."  Thomas, 278 F.3d at 959 (citation omitted). Plaintiff is not entitled to reversal on this ground.

**VII. CONCLUSION**

Consistent with the foregoing, and pursuant to sentence four of 42 U.S.C. § 405(g),[20] IT IS ORDERED that judgment be entered AFFIRMING the decision of the Commissioner and dismissing this action with prejudice.  IT IS FURTHER ORDERED that the Clerk serve copies of this Order and the Judgment on counsel for both parties.

DATED: March 21, 2013

JEAN ROSENBLUTH
U.S. Magistrate Judge

_____

[20]    This sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."

41